UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA M. DACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12CV47 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income under Title XVI of the Act. Claimant has filed

a Brief in Support of her Complaint; the Commissioner has filed a Brief in Support of his Answer,

and Claimant has filed a reply thereto. The parties consented to the jurisdiction of the undersigned

pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

On October 16, 2008, Claimant Pamela M. Dace filed Applications for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 132-36, 140-45) and

for Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

U.S.C. §§ 1381, et. seq. (Tr. 129-31, 137-39).[2] In the Disability Report Adult and filed in conjunction with the applications, Claimant stated that her disability began on November 9, 2004, due to a back injury, bipolar disorder, generalized anxiety disorder, short term memory problems, ADHD, and migraines. (Tr. 204-13). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr.65-67). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 87, 93-94). On October 6, 2009, a hearing was held before an ALJ. (Tr. 10-54). Claimant testified and was represented by counsel. (Id.). Vocational Expert J. Steven Dolan also testified at the hearing. (Tr. 47-53,125-28, 148-51). Thereafter, on March 15, 2010, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 68-79). On November 21, 2011, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision after considering the representative's brief and the undated medical record from Rebecca Lewis, BS. (Tr. 1-4, 348-52, 1027). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on October 6, 2009

#### 1.  Claimant's Testimony

At the hearing on October 6, 2009, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 10-54). At the time of the hearing, Claimant was thirty-two years of age. (Tr. 14). Claimant weighs 326 pounds. (Tr. 24). Claimant obtained a GED and attended

---

[2]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 12/filed March 16, 2012).

cosmetology school for therapeutic massage therapy. (Tr. 15). Claimant lives with her twelve-year old daughter in a duplex. (Tr. 15). She receives $422 a month in child support and food stamps and receives additional support from her church including paying for her medications and housing. (Tr. 26, 33). Claimant testified that she recently was awarded housing benefits. (Tr. 33).

Claimant last worked in 2008 at ITT making computer boards. (Tr. 16). Claimant also worked at Voss Transport and Penn Mack Personnel Services for short periods of time. In 2006 and 2007 she worked a number of jobs for short periods of time. (Tr. 16). Most of the jobs ended with Claimant being fired or being asked to leave. (Tr. 32). When working, she had problems following instructions because of her hearing problem. (Tr. 37).

Claimant testified that she cannot work because of a panic disorder, ADHD, an auditory process problem, a spastic colon, kidney infections, ear infections, and bipolar disorder. (Tr. 17). Claimant explained that she was diagnosed with bipolar disorder around age fifteen. (Tr. 42). Claimant reported not being able to schedule an appointment with a neurologist, because she does not have any insurance. (Tr. 18). Dr. Tucker performed her last colonoscopy in July 2008. (Tr. 27). Dr. Tucker instructed Claimant to take fiber. (Tr. 30). Claimant testified that she has to go to the bathroom twelve times a day. (Tr. 30, 45). In a follow-up visit in August 2009, Claimant reported not having a bowel movement for a week due to the new medication and needing to have a bowel movement three times a day. (Tr. 45-46). The ALJ noted how the report noted she was taking Miralax twice a day and no other medications were listed. (Tr. 46). Claimant explained that the doctor gave her samples of medications, because Medicaid would not cover the medication, Amitiza. (Tr. 46-47).

Claimant testified that she is prone to kidney infections and has three a year. (Tr. 30-31). She sometimes has accidents. (Tr. 32). Claimant has migraines twice a week lasting a two days (Tr. 39).

Claimant testified that she has sleep apnea. (Tr. 40). Claimant completed a sleep study. (Tr. 43). Claimant testified that although she is supposed to return to Dr. Dodd for treatment, she cannot afford the CPAP machine. (Tr. 44).

During the day, Claimant wakes up her daughter for school. (Tr. 19). Claimant is the primary caregiver for her daughter. (Tr. 21). She cooks and does the dishes and the laundry. (Tr. 19-20). Claimant drives and does the shopping. (Tr. 20). She attends church at least twice a month. (Tr. 21). Her vomiting and diarrhea cause Claimant to go to the bathroom at least twenty-four times a day. (Tr. 29). Claimant has crying spells every day. (Tr. 34). She takes a nap for one hour. (Tr. 41).

The ALJ noted how Claimant has been awarded disability. (Tr. 34). Claimant explained that a good job came along so she did not accept the disability award, because she did not want to live off the government. (Tr. 34).

Claimant testified that she can walk for thirty minutes and stand for thirty minutes (Tr. 21-22). She has no problem sitting on a good day. (Tr. 23). She can lift fifteen pounds. (Tr. 23).

Claimant testified that Dr. Barbin started treating her in 2008. (Tr. 24). She has not seen a psychiatrist on a regular basis since 2004. She testified Dr. Musami at Missouri Baptist treated her two times last year, but he wanted to prescribe medications causing side effects such as vomiting and loopiness. Claimant discussed with him the side effects of the medication. (Tr. 35).

She stopped seeing him, because Dr. Musami did not listen to her. (Tr. 35). Although she testified medications do not help, Claimant indicated that Klonopin helps. (Tr. 24, 35). She sought treatment in the emergency room around Christmas, but the doctor told her she was not a life worth saving and told her to find another doctor. (Tr. 25). Claimant testified she no longer has Medicaid. (Tr. 26).

Claimant testified that Pathways is not accepting any new patients. (Tr. 36). After completing the assessment, a doctor told her she was having a mental breakdown. Claimant testified that she was denied treatment because she lives in Franklin County, not Crawford County where Pathways is located. (Tr. 36-37). Claimant testified that she is moving so that she will qualify for treatment at Pathways, (Tr. 37).

### 2. Testimony of Vocational Expert

Vocational Expert J. Steven Dolan testified in response to the ALJ's questions. (Tr. 47-53). The ALJ found Claimant to have no past relevant work. (Tr. 48).

The ALJ asked Mr. Dolan to assume

an individual claimant's age, education level, no past relevant work. The individual is limited to performing medium exertional level work, can occasionally climb stairs, ramps, ropes, ladders, and scaffolds. The individual should avoid unprotected heights, excessive vibration, hazardous machinery, and the individual is limited to unskilled work only, which requires no more than occasional contact with the public and coworkers. Would there be any jobs in the national or regional economy that an individual with those particular limitations could perform?

(Tr. 48). Mr. Dolan opined that the hypothetical individual could perform dishwasher jobs with 10,000 jobs available in Missouri, hand packager jobs with 9,000 available, and cleaner jobs at the medium level with 40,000 jobs available in Missouri and 50 times those numbers available in the national economy. (Tr. 48).

The ALJ asked Mr. Dolan to assume

> an individual again of the claimant's age, same educational level, no past relevant work, and this individual is limited to light exertion level work. The individual can occasionally climb stairs and ramps and never climb ropes, ladders, and scaffolds, and can frequently stoop, kneel, crouch, and crawl as opposed to constantly, is limited to frequent. Again, the individual should avoid unprotected heights, excessive vibration, hazardous machinery. Again the individual is limited to unskilled work only, which requires no more than occasional contact with the general public and coworkers. Would there be jobs in the national or regional economy that an individual with those limitations could perform?

(Tr. 48-49). Mr. Dolan opined such individual could perform housekeeping and cleaner jobs with 20,000 jobs available in Missouri, mailroom clerk with 1,000 jobs, hand packager jobs at the light level with 9,000 jobs available in Missouri. (Tr. 49).

The ALJ noted that hypothetical three would be the same as two but "any job must allow for occasional unscheduled disruptions above the workday and workweek secondary to the need to take frequent bathroom breaks more than normal during the day, affects of medication, necessity to lie down for extended periods of time during the day, potential periods of decompensation during the workday, all of those particular types of factors. Would there be any jobs in the national or regional economy that an individual with all of those particular limitations could perform?" (Tr. 49). Mr. Dolan responded no. (Tr. 49). Mr. Dolan explained that all of his testimony had been consistent with the DOT except the hand packager job at the light level inasmuch as DOT hand packager jobs are categorized at the medium level, but he noted there are hand packager jobs at the light, medium, and heavy level in the real world. (Tr. 49-50).

In response to counsel's question regarding rural primary doctors treating people for depression and anxiety, Mr. Dolan agreed but noted it to be less common for the doctors to treat serious psychiatric illness such as bipolar disorder or schizophrenia without a referral to a

psychiatrist. (Tr. 51-52). Counsel then asked Mr. Dolan to keep in mind how Jennifer Barbin found in her mental residual functional capacity assessment dated August 31, 2009 as follows:

> she has extreme problems and extreme is defined as a major limitation, no useful ability to function in this area. She rated her as extreme in ability to remember work-like procedures, ability to understand and remember detailed instructions, ability to understand and carry out complex instructions, ability to maintain attention and concentration for extended periods, and ability to maintain attention and concentration for extended periods, and ability to maintain regular attendance and be punctual, and ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, all in the extreme category. If we added that to the hypotheticals by this treating doctor, Hypotheticals 1 and 2, would that preclude the jobs that you mentioned?

(Tr. 52). Mr. Dolan agreed. (Tr. 52). In response to the ALJ's question regarding how these doctors treat such individuals, Mr. Dolan noted by prescribing medication. (Tr. 52).

### 3. Open Record

A review of the record shows that counsel submitted the additional medical records as requested by counsel to the ALJ before he issued a decision denying Claimant's claims for benefits. (Tr. 53, 976-1027).

### 4. Forms Completed by Claimant

In the Function Report - Adult, Claimant reported stopping work through a temp agency, because she was being harassed at work. (Tr. 205). Claimant worked as a nurse's assistant from 2001-2004 feeding, bathing, and dressing patients, cleaning, cooking, and shopping. (Tr. 206). Claimant reported completing cosmetology school in 2005. (Tr. 212).

In the Function Report Adult - Third Party completed on January 10, 2008, Claimant reported taking care of her daughter and taking care of pets including feeding and bathing the pets. (Tr.215). Claimant prepares meals twice a day. (Tr. 216). Claimant cleans, does the

laundry and household repairs, irons, and mows the lawn. (Tr. 216). Claimant goes grocery shopping only as needed. (Tr. 217).

In the Missouri Supplemental Questionnaire completed on January 10, 2008, Claimant reported being able to do the laundry and the dishes, make the bed and change the sheets, iron, vacuum, take out the trash, mow the lawn, rake leaves, and gardening. (Tr. 234). Claimant can shop for one hour as needed. (Tr. 234). In an average day, Claimant fixes breakfast for her daughter and then she cleans the house as needed. (Tr. 235).

In the Missouri Supplemental Questionnaire completed on June 4, 2008, Claimant reported her activities to include watching television, reading books, and reading a chapter in a book with her daughter. (Tr. 306).

## III.    Medical Records

On November 25, 2002, Claimant reported being assaulted by her roommate. (Tr. 491-97). The doctor diagnosed her with contusion of the mid chest and small abrasion above the left eye. (Tr. 492).

On November 27, 2002, Claimant reported being treated in the emergency room at Missouri Baptist after an assault by a roommate. In the emergency room at St. John's Mercy Hospital, Claimant presented with confusion and traumatized by the assault. Examination showed a full range of motion of her extremities. The neuro examination showed Claimant to have normal motor strength in all four extremities. (Tr. 520). X-ray results showed normal cervical spine. (Tr. 521-22). The doctor diagnosed her with a concussion and contusions to the head and neck. (Tr. 521). The doctor prescribed Vicodin only for severe pain and continued Ibuprofen and recommended counseling at Family Wellness Center. (Tr. 521).

On January 22, 2003, Claimant reported being very stressed due to her divorce proceedings and requested Xanax. (Tr. 384). Dr. Hill prescribed Xanax. (Tr. 384).

Claimant received treatment in the emergency room at St. John 's Mercy Hospital on March 1, 2003, for probable miscarriage but incomplete AB. (Tr. 525). The doctor prescribed antibiotics to prevent possible pelvic infection. (Tr. 525).

On March 31, 2003, Claimant called and requested a stronger medication since her car was stolen on Friday. (Tr. 383). On April 4, 2003, Claimant reported missing her appointments due to lack of transportation and requested a medication to calm her. After being prescribed Xanax, she called and indicated Xanax does not work for her, it just makes her angry. (Tr. 383).

The April 7, 2003 CT of her pelvis showed an enlarged right ovary with probable ovarian cyst with no evidence of renal obstruction or bladder abnormality. (Tr. 407-08).

In a follow-up visit on April 14, 2003, Claimant reported being very stressed because of her divorce and lack of transportation. (Tr. 381). Claimant reported being unable to work or go to school. Dr. Hill prescribed medications. (Tr. 381).

On April 29, 2003, Claimant reported pelvic pain to the doctor in the emergency room at St. John's Mercy Hospital. (Tr. 528). "She denie[d] any other significant medical problems, specifically denie[d] any other history of cardiovascular, pulmonary, renal, GI/GU, hepatic or any other medical problems or complications." (Tr. 528). In the impression, the doctor noted Claimant has right ovarian enlargement and presented for diagnostic laparoscopy. (Tr. 529). Claimant had a diagnostic laparoscopy. laser ablation of endometrial implants, and laser aspiration of right ovarian endometrioma. (Tr. 530-31).

In an office visit on June 2, 2003, Claimant reported being in a rear-end accident by a car going 40 miles per hour and having back and neck pain. (Tr. 380). She did not go to the emergency room. Examination showed tender cervical and thoracic paraspinus. Dr. Hill prescribed Motrin and Flexeril. (Tr. 380). On June 12, 2003, Claimant reported being treated by a chiropractor and the treatment helping her. (Tr. 379). On June 18, 2003, Claimant called the office and requested more pain medication for her back. (Tr. 378). She indicated that she would be leaving for Florida and driving eighteen hours straight. (Tr. 378). The June 17, 2003 CT of her cervical spine showed loss of the normal lordosis probably due to muscle spasm. (Tr. 406, 503)

On June 25, 2003, Claimant received treatment in the emergency room at Missouri Baptist Hospital after injuring her foot while pulling a metal cart. (Tr. 488)

In a follow-up visit on July 22, 2003, Claimant reported working sixty hours a week and being tired and stressed. (Tr. 376). Dr. Hill prescribed Wellbutrin and Klonopin. (Tr. 376). On August 3, 2003, Claimant reported Wellbutrin not helping and having a lot of anxiety caused by being threatened by someone, a girlfriend committing suicide, and an exboyfriend dying. (Tr. 375). Dr. Hill prescribed Buspar. (Tr. 375). On September 3, 2003, Claimant reported doing better, not taking Buspar, and having chills and vomiting for one day. (Tr. 374). Dr. Hill prescribed Soma for her cervical strain and a medication for gastroentitis. (Tr. 374). In a follow-up visit, she reported right ear pain and receiving treatment in the emergency room for ear abscess. (Tr. 373). Dr. Hill prescribed Keflex. Claimant missed her follow-up appointment on September 23, 2003. (Tr. 373).

On October 20, 2003, Claimant reported increased stress due to executing her divorce papers and being evicted from her house. (Tr. 372). Dr. Hill treated Claimant on October 23 for muscle spasms in her neck and prescribed Soma, Darvocet, and physical therapy. For her anxiety, he prescribed Wellbutrin and Klonopin. (Tr. 372). Claimant started physical therapy at St. John's Mercy Hospital on November 3, 2003 for cervical strain from a motor vehicle accident. (Tr. 535). The therapist noted she arrived late for her appointment. (Tr. 535). The treatment notes reflect Claimant returned on November 5, 2003, but she was a no show/no call on November 7 and 10, 2003. (Tr. 536). In a follow-up call on November 21, 2003, Claimant reported wanting to continue therapy elsewhere. (Tr. 536). On November 20, 2003, Claimant called asking for a new physical therapy referral because she did not like the first one and requested a refill of Darvocet. (Tr. 271).

Examination showed nodules in her neck. (Tr. 370). The December 16, 2003 x-ray of her chest revealed negative for acute process. (Tr. 405, 504). On January 7, 2004, Dr. Hill noted tenderness in her neck. (Tr. 368). Dr. Hill prescribed Wellbutrin and two Z packs. Claimant reported Wellbutrin keeping her awake and requested Valium to assist in sleeping. Dr. Hill prescribed Valium. (Tr. 368).

In the physical therapy treatment note of December 23, 2003, Claimant reported neck pain caused by motor vehicle accident on May 30, 2003. (Tr. 477). Examination showed cervical flexion and extension within normal limits. (Tr. 477). On December 26, Claimant reported feeling better after last visit. (Tr. 479). On December 30, she called and rescheduled her appointment to the next day. On December 31, she canceled her appointment because of her move. On January 2, 2004, Claimant reported feeling weak when she tried to move items during

move.  (Tr. 479).  The therapist noted Claimant has multiple trigger points and soft tissue

tightness.  (Tr. 479-80).  In a follow-up visit, the therapist found multiple trigger nodules

remained.  (Tr. 480).  On January 13, she reported her back area continues to hurt, but it is much

better than it has been.  (Tr. 481).  In a follow-up treatment, the therapist noted Claimant has

thoracic tension and therapy reduced tightness.  (Tr. 482).  Claimant returned for treatment on

January 20.  (Tr. 482).  She reported her back pain is much better and improvement in her

cervical range of motion.  (Tr. 483).  Claimant was a no show for the January 27 and 29

appointments.  (Tr. 484).  The February 5, 2004 entry notes during a phone call, a person

reported Claimant had surgery the night before.  After receiving no further contact from Claimant,

the therapist discontinued physical therapy treatment on March 1, 2004.  (Tr. 484).

Claimant had a laparoscopy with removal of right ectopic pregnancy performed by Dr.

Robert Haskins at St. John's Mercy Hospital on February 4, 2004.  (Tr. 538, 542, 810-11, 815-

16).  Claimant reported taking no current medications.  A sonogram showed right adnexal mass

appearing to be a fetal pole about five weeks gestation with no free fluid in the cul-de-sac being

consistent with an ectopic pregnancy.  (Tr. 539, 541).

On February 9, 2004, Claimant reported she had a tubal pregnancy and having had surgery

and needing a refill of medications.  (Tr. 366).

 On May 16 and 20, 2004, Claimant called requesting medication refills.  (Tr. 362).  Dr.

Hill refilled her Soma prescription but refused her refill request for Soma on May 25, 2004, noting

she received a refill of thirty tablets on May 20, 2004.  (Tr. 362).

On July 9, 2004, Claimant reported having nasal congestion for two weeks.  (Tr. 360).

Dr. William Fritz noted she smokes two packages of cigarettes a week.  (Tr. 360).  He discussed

smoking cessation and prescribed a Z pack and Welbutrin for her anxiety. (Tr. 361). In follow-up on August 24, 2004, Dr. Fritz treated Claimant for a cough. (Tr. 358). Claimant reported having a severe headache for two days and a concussion eighteen days earlier. (Tr. 469). The emergency room doctor at Missouri Baptist Hospital diagnosed Claimant with a migraine headache and treated Claimant by giving her an injection of Vicodin and Ultram and prescribed medications as treatment. (Tr. 471-72).

In a follow-up visit in Dr. David Giem's office, Claimant reported having a headache for three days and having experienced a concussion a couple of weeks earlier. (Tr. 561, 607). Dr. Giem prescribed Klonopin, Vicodin, and Levsin and ordered a CT of her brain. (Tr. 561, 607). The November 17, 2004 CT examination of her brain was unremarkable. (Tr. 469). On November 24, 2004, Claimant reported having anxiety and a short attention span. (Tr. 562).

In December, 2004, Claimant reported being a full-time student at a cosmetology school and being worried about her student loans. (Tr. 563, 605). She has a short attention span and feeling anxious. Claimant has gained seventy pounds in the last year. (Tr. 563, 605).

On January 19, 2005, Dr. Giem treated Claimant for a possible sinus infection, and she reported being worried abut school loans. (Tr. 563, 606). She is a full time student at a cosmetology school. She quit smoking five months earlier. (Tr. 563, 606).

On March 2, 2005, Claimant called the office requesting refills of Klonopin and Valium. (Tr. 563, 606). The treatment note reflects that Claimant was not given a Valium refill. (Tr. 563, 606). Claimant reported being diagnosed as a child with ADHD and taking Ritalin until she was seventeen. (Tr. 565, 603). After being prescribed the ADHD medications on March 17, 2005,

Claimant reported on March 31, 2005, feeling better and the medication working. She is studying cosmetology books. (Tr. 565, 603).

On April 18, 2005, Claimant reported having chest pain after mowing the grass. (Tr. 564, 604). Claimant was off school for the week. (Tr. 564, 604).

Claimant received treatment in the emergency room at Missouri Baptist Hospital on April 27, 2005, for a cough and chest tightness. (Tr. 465-66). The radiology report showed no acute cardiopulmonary changes. (Tr. 468).

On June 9, 2005, Claimant sought treatment in the emergency room at St. John's Mercy Hospital for chronic arm pain and hand swelling. (T. 544, 808). Ms. Karen Biermann, a family nurse practitioner, noted Claimant seemed "pretty insistent on ... the details of how much pain she is in." (Tr. 544, 808). Musculoskeletal examination showed a nodule in her left forearm and another smaller one on the arm. Ms. Biermann observed Claimant to be somewhat melodramatic with the examination and noted she has a full range of motion in the shoulder, is able to flex and extend the elbow, and at the wrist. Ms. Biermann noted how Claimant continued to stress how painful her arm was with the radiating pain into the shoulder and how she had to wear the Ace wrap, and how she would not be able to work. Claimant admitted reporting this lump to her primary care physician and he kind of "blew it off" and tended to ignore it. In the assessment, Ms. Biermann noted drug-seeking behavior. (Tr. 544, 808). Ms. Biermann made a referral for J.F.K. Clinic or to her primary care physician and noted Claimant "left before instructions could be given and said that she would just go to her family doctor." (Tr. 545, 809).

On June 22, 2005, Claimant reported a lump in her left forearm and numbness in her hands. (Tr. 566, 601). Dr. Giem explained the lesion unlikely to be cancer and refilled her medication regimen and incised the lesion. (Tr. 566, 601). In follow-up treatment, Dr. Giem noted the incision healing well and removed the sutures. (Tr. 567, 602). Claimant reported having pain in her neck and low back when standing. (Tr. 567, 602).

On July 18, 2005, Claimant reported injuring her right leg after jumping into river water and hitting a rock. (Tr. 567, 600, 602). Claimant reported being able to walk, but she would like crutches. (Tr. 567, 600, 602). In the July 19, 2005, radiology report, the history noted how Claimant jumped off a cliff and landed on a rock and thereafter experienced pain in her knee and heel. (Tr. 464). Lateral examination of the right tibia and fibula showed no plain film abnormality. (Tr. 464).

The August 26, 2005, radiology report showed no evidence of bowel obstruction. (Tr. 461).

On September 1, 2005, Claimant reported having neck and low back pain since a motor vehicle accident in 2002. (Tr. 569, 599). She was hit from the rear and thrown forward two car lengths. Dr. Giem ordered a MRI of her cervical and lumbar spine. (Tr. 569, 599). The MRI results showed minimal disk bulge and minimal bulge. (Tr. 569, 599).

The September 13, 2005, Endosocpy Report revealed probable irritable bowel syndromee, and Dr. Barbara Dixon-Scott continued Claimant's Zelnorm and prescribed Librax and MiraLax. (Tr. 458-59).

The September 19, 2005 MRI of her cervical spine showed minimal asymmetric changes and definite evidence of focal disk protrusion or significant canal stenosis or significant neural

foraminal narrowing. (Tr. 505, 805). The MRI of her lumbar spine showed a minimal density on the final lower-most axial image to the left at the L5-S1 immediately adjacent to the nerve root. (Tr. 806).

On September 28, 2005, Claimant reported anxiety, difficulty breathing, and crying. (Tr. 570). Dr. Giem noted situational possible and refilled Darvocet for her back. (Tr. 570).

The October 24, 2005, Endoscopy Report showed non-ulcerative dyspepsia, and Dr. Dixon-Scott recommended Claimant start taking Zantac two times daily. (Tr. 450-51).

Dr. Giem refilled her Darvocet, Soma, and Klonopin medications on November 16, 2005. (Tr. 571, 596). On November 30, 2005, Claimant requested being prescribed different medications due to weight gain and admitted being off Ritalin. Dr. Giem prescribed Wellbutrin, Valium, and Soma. (Tr. 571, 596).

On December 7, 2005, Dr. Giem diagnosed Claimant with bronchitis. (Tr. 596).

On December 13, 2005, Dr. Kenneth Hamai performed a vaginal hysterectomy and bilateral salpingo-oophorectomy as treatment for her pelvic pain, dysmenorrhea, dyspareunia, and history of endometriosis. (Tr. 547-48, 550-51, 791, 794-95). Claimant denied "other significant medical problems, especially denies any other history of cardiovascular, pulmonary, renal, GI, pancreatic problems or complications. (Tr. 548, 792).

On December 14, 2005, Dr. Giem refilled her Valium prescription, #90, after restarting Claimant on November 30, 2005.. (Tr. 574).

In the December 16, 2005, treatment note Claimant reported bleeding from hysterectomy incision site and indicated that she "perhaps ... has been doing more than she should. She has been out shopping today." (Tr. 506, 783, 787). Claimant returned to the emergency room two

days later complaining of abdominal pain. (Tr. 508). She went Christmas shopping on Wednesday and Thursday in a wheel chair, but at times, she had to push the wheelchair. The doctor gave her Dilaudid IV and Phenergan as treatment and her symptoms improved. (Tr. 508).

On December 18, 2005, Claimant received treatment in the emergency room for abdominal pain and discomfort. (Tr. 774). Claimant reported being a full time student. (Tr. 774). CBC was totally normal, and obstructive series nonspecific. (Tr. 776). The x-ray of her chest showed a nodular appearing density right lung. (Tr. 789).

On December 30, 2005, Claimant reported bowels move well now during treatment by Dr. Giem. (Tr. 575, 595). Claimant had a hysterectomy on December 13 and started vaginal bleeding earlier in the day. She admitted having been on her feet a lot. (Tr. 575, 595).

On January 4, 2006, Claimant requested a Valium refill but there is notation "too soon Valium." (Tr. 575, 595). On January 11 and February 8, 2006, Dr. Giem refilled her Valium prescription. (Tr. 575, 595).

On January 16, 2006, Claimant returned to the emergency room at St. John's Mercy Hospital and reported lower abdominal pain and having a hysterectomy one month earlier. (Tr.511, 762). She reported having pain in her legs and back and being out of Percocet and Soma, but she acknowledged the medications work very well for her pain. (Tr. 511, 763). She smokes a half a package of cigarettes a day, and Dr. Giem is her primary care physician. (Tr. 511, 763). Examination showed her height to be five feet five inches and her weight 180 pounds. (Tr. 512). Claimant told the emergency room doctor she did not want any pain medications, but she told the nurse the opposite at the time of discharge and so the doctor prescribed Darvocet. (Tr. 512).

On February 22, 2006, Claimant reported decreased abdominal pain since her hysterectomy but having shortness of breath and chest pain for the last month. (Tr. 573, 594).

In follow-up treatment on May 10, 2006, Claimant having fewer panic attacks after having the hysterectomy. (Tr. 572, 593). On June 21, 2006, she had a panic attack caused by her mother upsetting her. Claimant indicated that she was doing well until she started living with he mother. Dr. Giem prescribed Soma, Klonopin, and Caltrate. (Tr. 572, 592). On July 31, 2006, Claimant reported wanting to lose the thirty pounds she had gained over the last two years. (Tr. 577, 592).

An August 9, 2006, CT scan showed linear parenchymal disease in the right lower lobe and extremely tiny nodule. (Tr. 448).

The November 20, 2006, x-ray of her knee showed negative four view exam of the left knee. (Tr. 446).

In a follow-up medication refill visit on April 4, 2007, Claimant reported having migraine headaches for years and a history of skull concussion. (Tr. 577).

Claimant returned to Dr. Giem's office on June 4, 2007, for a medication check up. (Tr. 591). Anxiety, obesity, and pain are noted in the impression. Dr. Giem prescribed Klonopin, Soma, and Estratest. (Tr.591). Dr. Giem ordered refills of Soma, Motrin, and Klonopin on July 5 and August 7, 2007. (Tr. 590).

On July 13, 2007, Claimant reported having blood in her urine and lower back pain. (Tr. 437, 440). Examination showed tenderness and her mood to be appropriate. (Tr. 438). The treatment notes from Missouri Baptist Hospital note Claimant made loud and obnoxious verbal comments and demanding to be placed in a room. (Tr. 442). The radiology report revealed no

evidence of urolithiasis or obstructive uropathy bilaterally and tiny amount of pelvic free fluid. (Tr. 443). The CT of her bladder revealed no definite right or left renal and at most extremely tiny amount of fluid in the lower pelvis. (Tr. 444).

On September 10, 2007, Claimant reported having a migraine for four days in follow-up with Dr. Giem. (Tr. 590).

Claimant missed her scheduled appointments in Dr. Giem's office on October 3 and 10, 2007. (Tr. 578, 589). In the October 17, 2007, treatment note Claimant reported being prescribed Valium during treatment in an emergency room. (Tr. 578, 589).

On October 14, 2007, Claimant received treatment in the emergency room at Missouri Baptist Hospital. (Tr. 431). She reported being stressed out due to two deaths in the family within one week and being out of medications and Klonopin not effective for period over one week. (Tr. 431, 434). Examination showed her thought process to be logical and insight good and memory intact. (Tr. 432). The doctor prescribed Valium. (Tr. 432).

On November 10, 2007, Claimant received treatment in the emergency room at Missouri Baptist Hospital for chest pain. (Tr. 411). The emergency room doctor attributed her chest pain to anxiety. (Tr. 412). The x-ray of her chest showed no acute disease. (Tr. 430).

In follow-up treatment with Dr. Giem on November 12, 2007, he refilled her Valium prescription. (Tr. 578).

On November 13, 2007, Claimant reported heart palpitations and a headache. (Tr. 513, 715). The emergency room doctor at St. John's Mercy Hospital noted that her work up, including an EKG, was normal. (Tr. 513, 717). The doctor ordered Compazine and Benadryl intravenously and a Holter report. (Tr. 513). The CT of her head was negative for acute process

and abnormality. (Tr. 517, 723). The Holter Report showed no evidence of significant arrhythmias and very rare premature ventricular complexes and premature atrial complexes. (Tr. 519, 732). Her discharge diagnosis included heart palpitations and migraine headache. (Tr. 728-29).

In a follow-up on November 12, 2007, Claimant complained of chest pain and pain in neck and back and reported recent treatment in emergency room. (Tr. 578, 589). Dr. Giem prescribed Valium as treatment. (Tr. 578, 589).

On January 31, 2008, Claimant reported she wanted to go to school and starting a new job on Monday in follow-up treatment with Dr. Giem. (Tr. 580, 588).

On February 15, 2008, Claimant reported having right back pain and abdominal to the doctor in the emergency room. (Tr. 637, 640-41). Examination showed tenderness in her back and abdominal distention. (Tr. 639). The abdominal sonography was a negative ultrasound of the right upper quadrant and showed no gallstones. (Tr. 646, 668).

On February 23, 2008, Claimant sought treatment in the emergency room at Missouri Baptist Hospital, but she left before being treated and without notifying anyone. (Tr. 634-35). Claimant reported having a knotted feeling in her stomach and severe anxiety from being harassed by her daughter's biological father. (Tr. 636). Claimant requested going to the stress unit indicating that she needs a break. (Tr. 636).

On February 24, 2008, Claimant received treatment in the emergency room at Missouri Baptist Hospital for back pain and anxiety caused by problems with her daughter's father. (Tr. 630). She reported stress in life and anxiety. (Tr. 633).

On March 3, 2008, Dr. Giem treated Claimant for anxiety. (Tr. 586). She reported how another doctor accused her of trying to obtain drugs. Dr. Giem prescribed Xanax, Soma, Protanix, and Motrin. Claimant returned on March 27 and reported having family stress and being afraid of daughter's father. Dr. Giem continued her medication regimen. (Tr. 586).

On March 30, 2008, Claimant reported having abdominal pain starting two months earlier. (Tr. 583, 704). At the time of discharge, Claimant reported being almost pain free. (Tr. 584, 707). Her discharge diagnosis was gastroenteritis. (Tr. 710)

The March 31, 2008, abdominal chest radiography showed no evidence of bowel obstruction. (Tr. 629).

On April 2, 2008, Claimant received treatment in the emergency room for esophagus pain. (Tr. 652-53). The tomography of her abdomen and pelvis produced a negative exams. (Tr. 666). The upper gastrointestinal radiography produced a negative exam. (Tr. 667). The CT of her abdomen and pelvis showed her pelvis free of fluid and bladder unremarkable and no acute intraabdominal or pelvic process. (Tr. 669-70).

Claimant was admitted on April 3, 2008 to Missouri Baptist Hospital for treatment of gastroenteritis, dyspepsia, mild dehydration, and chronic anxiety disorder and placed on IVs as treatment. (Tr. 650, 671). Claimant denied having any overt depressive symptoms. (Tr. 671). The doctor prescribed Paxil for her chronic anxiety disorder with the hopes of getting her off her chronic benzodiazepine use. (Tr. 650). The doctor placed Claimant on Pepcid twice daily. (Tr. 674). Her discharge medications included phenergan, lomotil, paxil, and zantac. (Tr. 651).

On April 5, 2008, Claimant received treatment in the emergency room at Missouri Baptist Hospital for pain and swelling at the IV site of her right hand and forearm. (Tr. 620, 624). She had been discharged the day before. (Tr. 620).

The April 9, 2008 imaging study of Claimant's gallbladder showed normal findings. (tr. 619).

In the April 23, 2008, treatment note, Dr. Giem noted Claimant needed disability paperwork to be completed. (Tr. 585, 852). She reported having back pain, inability to pass state test for cosmetology, and having conflict with her daughter's father, he threatened to kill her. Dr. Giem advised her to contact HCUSA for psychological evaluation. (Tr. 585, 858).

On May 9, 2008, Dr. Phillippe Eljaiek treated Claimant for depression and anxiety, (Tr. 857). Claimant reported hypogastric pain, history of smoking, and significant amount of depression and anxiety. Dr. Eljaiek recommended she stop smoking, drink plenty of fluids, and try to lose weight and prescribed Wellbutrin, BuSpar, and Cipro. (Tr. 857).

In the May 26, 2008, treatment note, Dr. Giem noted how Danielle advised him to Provide Relations regarding not seeing Claimant as a patient inasmuch as she is noncompliant and threatens to make a grievance claim. (Tr. 587, 850). Claimant made a big scene twice in the office. (Tr. 587, 850).

On Mary 31, 2008, Claimant received treatment in the emergency room at Missouri Baptist Hospital for vaginal bleeding. (Tr. 612, 969). Examination of her pelvic revealed no signs of bleeding. (Tr. 613, 970). The emergency room doctor noted that Claimant left without being treated. (Tr. 614, 971). The treatment notes reflect how Claimant eloped from the

department. (Tr. 616, 973). The note shows Claimant left without being discharged or notifying the staff. (Tr. 616, 973).

On June 1, 2008, Claimant received treatment in the emergency room for vaginal bleeding and back pain. (Tr. 692).

Dr. Tucker treated Claimant on June 13, 2008 for alternating diarrhea and constipation and abdominal pain. (Tr. 680). Claimant reported babysitting for her mother. Dr. Tucker found Claimant to have probable severe irritable bowel syndrome and started her on Bentyl before meals. (Tr. 680). In the intake form, Claimant listed babysitting as her occupation. (Tr. 682). The study showed Claimant's abdomen to be within normal limits, and no sitz markers identified within the abdomen. (Tr. 832).

On June 28, 2008, Claimant reported back and neck pain after exercising and pulling weeds. (Tr. 963). The emergency room doctor diagnosed her with cervical neck pain and shoulder pain. (Tr. 964). Claimant reported passing out three days earlier, pulled on garden weeds, and played Wii. (Tr. 965). The note reflects Claimant's child approached the nurse's desk and asked "Can you give her something else than darvocet that makes her mean." (Tr. 968).

On July 1, 2008, Claimant received treatment in the emergency room at St. John's Mercy Hospital for diarrhea and abdominal pain. (Tr. 676-77). She indicated that she smokes. (Tr. 677). The colonoscopy showed a single flat polyp but otherwise normal colon. (Tr. 678, 829). The esophagogastroduodenoscopy showed normal entire esophagus and normal entire stomach. (Tr. 679, 827). The surgical pathology report revealed no evidence of malignancy. (Tr. 686-88).

On July 6, 2008, Dr. Tucker discussed Claimant's constipation, diarrhea, bloating, pain, and irritable bowel syndrome with her. (Tr. 819). Dr. Tucker noted she skips breakfast and does not eat well. (Tr. 819).

On July 13, 2008, Claimant reported having alternating diarrhea and constipation, bloating, and lots of abdominal pain. (Tr. 820). Dr. Tucker found Claimant to have probable irritable bowel syndrome. (Tr. 820).

On July 27, 2008, Claimant received treatment in the emergency room for irritable bowel syndrome. (Tr. 958).

In a phone conversation with the nurse, Claimant indicating she had developed abdominal pain consistent with her irritable bowel syndrome. (Tr. 819). Claimant indicated that she had gone to the emergency room in Sullivan. In a follow-up telephone conversation with the nurse on July 28, Claimant acknowledged she does not have a primary care physician and wants to use Dr. Tucker. The nurse explained how Dr. Tucker is a specialist, and Claimant needs to find a primary care physician. She reported being under stress due to a couple of recent funerals and a divorce, and she acknowledged her irritable bowel is worsened by such stressful situations. (Tr. 819).

In the August 6, 2008, letter, Dr. Tucker apprised Claimant she tried to call her at the number provided but this is not a working number. (Tr. 821). Dr. Tucker instructed Claimant to call the office if she has any problems. (Tr. 821).

The August 26, 2008, Physical Residual Functional Capacity Assessment ("PRFCA") form is included in the record. (Tr. 834-39). The PRFCA form states that Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour

workday. (Tr. 835). In support, the disability examiner cited to the medical record. (Tr. 835-36). With respect to manipulative, visual, and environmental limitations, the examiner found none existed. (Tr. 837-38). Lisa Buhr noted that Claimant lives as home with her daughter, and she cares for her daughter, does laundry, loads/unloads dishwasher, make/changes bed sheets, and does some gardening. (Tr. 839). She goes grocery shopping one to two times a week and prepares simple meals daily. She reads the newspaper and books and is able to drive. Ms. Buhr found Claimant's allegations were deemed to be not credible. (Tr. 839).

In follow-up treatment on September 8, 2008, Dr. Eljaiek noted Claimant to be obsessed with her Klonopin and Soma medications inasmuch as he cannot convince her to use any other type of medicine. (Tr. 854). Claimant complained of vague pain. Dr. Eljaiek included anxiety, depression, metabolic syndrome, spasm of back, and migraine headaches as his prognosis. (Tr. 854). Dr. Eljaiek opined that he spent a lot of time discussing with Claimant the fact that he will not be able to treat her since she is not compliant. (Tr. 855). Dr. Eljaiek provided Claimant with a list of names of other physicians that can take care of her. (Tr. 855).

On September 26, 2008, Claimant reported dropping a television on her lower left leg two weeks earlier. (Tr. 946-48). The emergency room doctor diagnosed her with a contusion. (Tr. 247).

On October 16, 2008, Claimant received treatment in the emergency room for colon spasm. (Tr. 942).

On November 11, 2008, Claimant received treatment in the emergency room for treatment of anxiety and panic disorder. (Tr. 934). Claimant reported changing doctors and then changing

medications and stop taking Klonopin  (Tr. 937).  She is in the middle of a divorce and has a psychiatric doctor appointment scheduled.  (Tr. 939).

On December 12, 2008, Claimant reported having back pain starting two months earlier. (Tr. 1017).  Dr. Jennifer Barbin noted she has chronic problems including cervicalgia and anxiety. (Tr. 1017).  Examination showed cervical spine has muscle spasm.  (Tr. 1018).  In the psychiatric examination, Dr. Barbin observed no unusual anxiety or depression.  (TR. 1018).  Claimant how she had been on depakote before and tolerated the medication well.  (Tr. 1019).  Dr. Barbin opined suspicion of bipolar, because Claimant reported becoming very angry/manic on antidepressants but in the assessment listed anxiety state.  Dr. Barbin continued her Soma and prescribed depakote and made a referral for physical therapy.  (Tr. 1019).  Claimant returned on December 16 for a medication refill and treatment of bipolar affective.  (Tr. 1015).  She reported to be doing much better on depakote but due to the swelling and weight gain, she would like to try another medication.  (Tr, 1016).  Dr. Barbin took Claimant off depakote and prescribed lamictal.  (Tr. 1016).

On December 30, 2008, Claimant received treatment for an adverse reaction to lamictal. (Tr. 928-29).  Claimant reported swelling and shortness of breath.  (Tr. 930).

On January 2, 2009, Claimant returned to Dr. Barbin's office complaining of a sore throat and nasal drainage.  (Tr. 1012).  Claimant requested continuing Klonopin and not taking another medication for anxiety until her edema is fully resolved.   (Tr. 1013).

In an initial evaluation on January 2, 2009, a physical therapist, Kerri Wallace, treated her upper back and neck pain.  (Tr. 912).  Ms. Wallace found tension in upper back and neck felt like needed a rub down.  (Tr. 912).  Ms. Wallace noted Claimant tolerated treatment well with

decreased pain and would continue physical therapy. (Tr. 913). Claimant returned for treatment

on five occasions and then cancelled the next appointment for personal reasons. (Tr. 914-15).

On January 19, 2009, she returned wearing a long leg extension brace and reported having a fall

over the weekend. (Tr. 916). Claimant reported feeling she has improved with therapy. Ms.

Wallace noted improvement in Claimant's cervical range of motion. (Tr. 916). On January 23,

2009, Claimant explained she will start knee rehab. (Tr. 917). On January 26, 2009, Claimant

reported falling again and having a sore neck. On January 30 and February 4 and 6, 2009,

Claimant cancelled her appointments. (Tr. 917, 919). She returned on February 9, 2009, and

reported tenderness to knee. (Tr. 919). On March 10, 2009, Ms. Wallace noted how Claimant

had not returned for treatment and discharged her. (Tr. 920).

On January 19, 2009, Claimant reported knee pain after an injury, and the pain relieved by

prescription pain medications and over-the-counter medications. (Tr. 1010). Examination

showed swelling and tenderness around knee joint. (Tr. 1011). Dr. Barbin ordered a MRI of her

knee to rule out meniscal tear or tendon rupture. (Tr. 1011).

The January 21, 2009 MRI of her right knee showed strain of the lateral patellar

retinaculum without evidence of full thickness tear and small right knee joint effusion. (Tr. 1025).

Claimant returned to Dr. Barbin's office to review the MRI results showing a strain (Tr. 1007).

Dr. Barbin observed Claimant to be tearful during the visit caused by increase in her weight again.

(Tr. 1009). Dr. Barbin explained how good diet, calorie counting, decreasing carbohydrate intake

all help with weight lost. Dr. Barbin suggested she attend a diet planners meeting like Weight

Watchers. Dr. Barbin ordered physical therapy as tolerated and a soft knee brace for support.

(Tr. 1009).

On January 24, 2009, Claimant received treatment for knee pain after having a fall last Friday at Rolla hospital. (Tr. 921). The MRI of her right knee showed strain of lateral patellar retinaculum without evidence of full thickness tear and small right knee joint effusion. (Tr. 927).

On February 4, 2009, Dr. Barbin treated Claimant's sore throat and ear discomfort. (Tr. 1004). Dr. Barbin diagnosed Claimant with acute sinusitis and otitis media. (Tr. 1005-06). Claimant returned on February 13 with cold symptoms and ear discomfort. (Tr. 1001). Examination of her ears showed impacted cerumen. (Tr. 1002). Dr. Barbin observed Claimant to have no unusual anxiety or evidence of depression and to be alert and oriented. (Tr. 1002). Dr. Barbin prescribed ear wax softener as treatment. (Tr. 1003).

On April 12, 2009, Claimant received treatment in the emergency room for chest and abdomen pain. (Tr. 896, 899). The radiology of her chest showed no active disease. (Tr. 906, 908-09).

On April 13, 2009, Claimant reported having had a tough few months because her father and stepfather both passed away, just finalized divorce, and finding a skin tag which may be obstructing her bowels. (Tr. 998). Claimant complained of back pain starting three days earlier and spasms. (Tr. 998). Examination showed tenderness in her abdomen. (Tr. 999). Dr. Barbin encouraged Claimant to exercise, prescribed a trial of trileptal and stool softeners, and referred her to Pathways. (Tr. 1000).

On April 26, 2009, Claimant received treatment in the emergency room for abdominal pain. (Tr. 887-89). The radiology report of her abdomen showed normal bowel gas pattern. (Tr. 893, 895).

On April 28, 2009, Claimant called Dr. Tucker's office and complained of severe abdominal cramps and trying to exercise. (Tr. 841). Walking seems to aggravate the pain. Claimant requested something for pain. Dr. Tucker agreed to prescribe Percocet but indicated he would not provide a refill. Claimant scheduled the first available appointment on June 18, 2009. In the appointment, Dr. Tucker explained to Claimant the diagnosis and treatment of irritable bowel syndrome and recommended she take Imodium one to two tablets when she has a bowel movement. (Tr. 841). Claimant failed to show up for her scheduled appointment on July 2, 2009. (Tr. 842).

On May 12, 2009, Claimant returned for follow-up treatment. (Tr. 995). Dr. Barbin noted Claimant to be doing well on trileptal. (Tr. 996).

On May 12, 2009, Claimant reported being dehydrated and having flu-like symptoms to the doctor in the emergency room. (Tr. 880-81). The doctor diagnosed Claimant with dehydration and gastroenteritis. (Tr. 884).

On May 18, 2009, Claimant reported having red streaks under her arms with no pain or tenderness. (Tr. 992). Dr. Barbin diagnosed her with keratosis pilaris and skin anomaly. (Tr. 993).

On June 9, 2009, Claimant received treatment in the emergency room for spastic colon and abdominal pain. (Tr. 873-75).

On July 1, 2009, Claimant reported having a cough and burning urine since swimming in the river one weak earlier. (Tr. 989). Dr. Barbin noted Claimant is taking medications regularly and doing better. Claimant reported using less knopolin since her friend left she does not have as

much stress.  (Tr. 989).  Dr. Barbin diagnosed Claimant with bipolar affective and noted controlled presently, hyperlipidemia, and acute urinary tract infection.  (Tr. 991).

The July 30, 2009 pulmonary function interpretation showed normal range of flow loop and no bronchodilator response and lung volumes otherwise normal other than a reduced expiratory reserve volume consistent with obesity.  (Tr. 869).

In a follow-up visit on July 31, 2009, Claimant reported possible bladder infection.  (Tr. 986).  Dr. Barbin diagnosed Claimant with dysuria.  (Tr. 987).

On August 15, 2009, Claimant received treatment in the emergency room for ear pain. (Tr. 862-63).

On August 17, 2009, Claimant received treatment as follow-up to the emergency room. (Tr. 983).  She reported ear pain and being given Vicodin and an antibiotic as treatment.  (Tr. 983).  Examination showed cerumen impaction in both ears.  (Tr. 984).  Dr. Barbin diagnosed Claimant with cerumen impaction and hyperlipidmia and suggested diet and exercise as treatment. (Tr. 985).

On August 21, 2009, Claimant reported feeling the need to have bowel movements three times a day due to urgency and pressure.  (Tr. 842).  Dr. Tucker discussed treatment options and decided to have Claimant try a low dose of Amitiza and reasses in three weeks.  (Tr. 842).

Claimant returned to Dr. Barbin's office on August 25, 2009 and reported she maybe losing her disability and having a lot of stress the last week.  (Tr. 980).  Dr. Barbin found Claimant to be anxious, feeling hopeless, having mood swings and poor insight, exhibiting poor judgment, and having poor attention span and concentration.  (Tr. 981).  Dr. Barbin included in her assessment bipolar affective and noted how Claimant does not think that she needs to be on

medications.  (Tr. 981).  Dr. Barbin explained how Claimant needs to be on controlled

medications and offered to start her on vistaril and refer her to a psychaitrist, but Claimant refused

the medications.  Dr. Barbin told Claimant "there really isn't more I can do if she keeps refusing

treatment."  (Tr. 981).

Claimant returned to Dr. Barbin's office on August 31 so Dr. Barbin could fill out the

paper work for her mental capacity to be filled for her disability.  (Tr. 977).  Dr. Barbin observed

Claimant to be anxious and crying but consolable.  (Tr. 977-78).  Psychiatric examination showed

Claimant's affect to be normal, and she is oriented to time, place, person and situation.  (Tr. 978).

Dr. Barbin noted Claimant to be anxious, feeling hopeless, and having mood swings and poor

insight and judgment.  Dr. Barbin found Claimant to have normal attention span and

concentration.  Dr. Barbin noted how she filled out the paperwork consisting of multiple

questions.  Dr. Barbin noted that Claimant reported she does not think she needs medications and

wants to get away from her mother.  Dr. Barbin discussed with her the need for a psychiatric

consultation, but Claimant said she did not want to see a psychiatrist only psychologist because

insurance will not pay, and she cannot afford a psychiatrist.  Dr. Barbin explained she can seek

counseling with a church and until she can accept medications, she cannot help her.  Dr. Barbin

noted how "px then went on that her mom is the problem but she cannot get away, that she had

ADHD before but never told me, etc.  told px I can help her in other ways but really needs a

psychiatrist."  (Tr. 978).

The August 31, 2009 Mental Residual Functional Capacity Assessment Form completed

by Dr. Barbin found Claimant to be extremely limited in her ability to cope with stress and

moderately limited in her ability to behave in an emotionally stable manner and be reliable.  (Tr.

844).  Dr. Barbin noted how Claimant comes to the clinic for anxiety, stress, and crying spells. (Tr. 845).  Dr. Barbin found Claimant to be moderately limited in her ability to accept instructions and to respond to criticism.  (Tr. 845).  With respect to concentration, understanding and memory, Dr. Barbin found Claimant to be extremely limited in her ability to remember work-like procedures, her ability to understand and remember detailed and complex instructions, her ability to maintain attention and concentration for extended periods, her ability to maintain regular attendance and be punctual, her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and her ability to respond to changes in work setting.  (Tr. 846-47).  Dr. Barbin opined Claimant would have repeated episodes of decompensation.  (Tr. 847).  With respect to occupational ability, Dr. Barbin found Claimant to have poor to none in her ability to deal with work stresses, her ability to maintain attention, and her ability to respond to changes in a work setting.  (Tr. 847).  Dr. Barbin opined Claimant does not deal well with stress.  (Tr. 848).

Rebecca Lewis, a community support specialist at Pathways Community Behavioral Healthcare, wrote an undated "To Whom It May Concern" letter.  (Tr. 1027).  In the letter, she noted how Claimant recently became involved with Pathways' services and outlined how Claimant would receive psychiatric treatment, psychotherapy, and have a case worker working with her on a weekly basis. Claimant would also receive assistance in symptom control and coping skills.  Ms. Lewis noted how Claimant has the diagnosis of post traumatic stress disorder and generalized anxiety disorder and opined that these disorders would take some work to be managed.  (Tr. 1027).

**IV. The ALJ's Decision**

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through September 30, 2008.[3] (Tr. 70). Claimant has not engaged in substantial gainful activity since November 9, 2004, the alleged onset date. (Tr. 70). The ALJ found that the medical evidence establishes that Claimant has the severe impairments of obesity, panic disorder with anxiety, and irritable bowel syndrome, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 70-71). The ALJ Claimant has the residual functional capacity to perform medium work except for the following additional limitations: "occasionally climb ramps, stairs, ropes, ladders, and scaffolds; frequently stoop, kneel, crouch, and crawl; she must avoid concentrated exposure to excessive vibration, industrial hazards, and unprotected heights; and she is limited to unskilled work that requires no more than occasional contact with the general public or co-workers." (Tr. 71). The ALJ found that Claimant has no past relevant work. (Tr. 78). Claimant's date of birth is October 19, 1976 making her a younger individual on the alleged disability onset date. The ALJ noted that Claimant has at least a high school education and is able to communicate in English. (Tr. 16). The ALJ noted that transferability of job skills is not material to the determination inasmuch as using the Medical-Vocational Rules he found that Claimant is not disabled regardless whether Claimant has transferable job skills. (Tr. 78). Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ determined

---

[3]To qualify for DIB, a claimant must establish existence of disability before expiration of his insured status. Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). To be entitled to SSI, a claimant must that she was she was disabled while her application was pending. See 20 C.F.R.§§ 416.330, 416.335. The relevant period with respect to SSI application is November 9, 2004 through the date of the ALJ's decision, March 15, 2010.

that there are jobs in significant numbers in the national economy that the Claimant can perform including dishwasher, hand packager, and cleaner jobs. (Tr. 78-79). The ALJ found that Claimant was not under a disability from November 9, 2004 through the date of the decision. (Tr. 79).

## V.      Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant is

not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is

found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

> 1.      The credibility findings made by the ALJ.
>
> 2.      The claimant's vocational factors.
>
> 3.      The medical evidence from treating and consulting physicians.
>
> 4.      The claimant's subjective complaints relating to
> exertional and non-exertional activities and impairments.
>
> 5.      Any corroboration by third parties of the
> claimant's impairments.
>
> 6.      The testimony of vocational experts when required which
> is based upon a proper hypothetical question which sets forth the claimant's
> impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008.  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion."  Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.  Id.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

     Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to incorporate all of Dr. Barbin's limitations in her RFC

and the hypothetical question to the vocational expert.  Claimant also contends that the ALJ erred

by failing to give good reasons for rejecting the opinions of Dr. Barbin.  Next, Claimant contends

that the ALJ's decision is not supported by substantial evidence inasmuch as the ALJ rejected the

only work-related limitations from a treating or examining doctor.  Finally, Claimant contends the

ALJ failed to consider the combined effects of her multiple impairments.

     The undersigned finds that the ALJ erred in his RFC assessment and that the case should

be remanded for further review.  Residual Functional Capacity (RFC) is a medical question, and

the ALJ's assessment must be supported by substantial evidence.  Hutsell v. Massanari, 259 F.3d

707, 711 (8th Cir. 2001) (citations omitted).  RFC is defined as the most that a claimant can still

do in a work setting despite that claimant's limitations.  20 C.F.R. § 416.945(a)(1). " Ordinarily,

RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary

work setting on a **regular and continuing** basis, and the RFC assessment must include a

discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). This evidence includes descriptions and observations of the claimant's limitations from the alleged impairment(s) and symptoms provided by the claimant and by family, neighbors, friends, or other persons. 20 C.F.R. § 416.945(a)(3). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2000). The Eighth Circuit clarified in Lauer that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace...' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Lauer, 245 F.3d at 704. Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical

question, some medical evidence must support the determination of the claimant's RFC.");
Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

The ALJ opined that "in reaching a conclusion regarding whether the claimant is disabled, I have also considered the assessments of the State agency. Opinions of State agency consultants are not entitled to controlling weight, but must be considered and weighed as those of highly qualified physicians who are experts in the evaluation of medical issues under the Social Security Act." (Tr. 76). The ALJ noted that "Ms. Buhr concluded that the claimant could perform the exertional requirements of medium work. She also stated the following: there was no evidence of a medically determinable attention deficit hyperactivity disorder or bipolar disorder; the evidence does not indicate the presence of a memory disorder; and all mental allegations were deemed non-severe. I find, however, that Ms. Buhr is not an acceptable source of medical information and her opinions are not entitled to substantial weight." (Tr. 76). As the ALJ noted, Ms. Buhr, a single decision-maker, completed the Physical Residual Functional Capacity Assessment. The ALJ found Ms. Buhr not to be an acceptable source of medical information and opined that he did not give her opinions substantial weight.

"An ALJ may rely upon the opinion of a nontreating or consultative 'medical source,' but he may not give the same weight to the opinion of a nonmedical, or lay, state agency evaluator." Williams v. Astrue, 2012 WL 946806, at *9 (E.D. Mo. Mar. 20, 2012). A single decision maker is not considered a medical source. See Gaston v. Astrue, 2012 WL 3045685, at *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, at *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decision-maker" as "single decision-maker" was a disability counselor and not an acceptable

medical source as defined by the regulations). Indeed, it is error for an ALJ to consider a PRFCA by a single decision-maker. See Andreatta v. Astrue, 2012 WL 1854749, at *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by a single decision-maker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decision-makers).

In this case, although the ALJ opined he did not assign this opinion substantial weight, he did, however, assign this opinion some weight. The opinion of the single decision-maker like the ALJ's RFC found Claimant able to perform work at the medium exertional level. There is no other evidence on the record showing Claimant able to work at the medium exertional level. Thus, the ALJ erred in relying on the opinion of the single decision-maker. See Andreatta, 2012 WL 1854749, at *10 (holding remand required when ALJ relied on the opinion of a single decision-maker, even if the RFC would be permissible absent consideration of single decision-maker's report).

In this case, there is no opinion in the record from any physician regarding Claimant's work-related limitations except the work-related limitations found by Dr. Barbin. There is no opinion in the record from any physician regarding Claimant's work-related limitations. The record shows that Claimant did not undergo a consultative physical examination. There is no opinion from any physician regarding how Claimant's impairments affect her ability to work. The ALJ found that Claimant's obesity, panic disorder with anxiety, and irritable bowel syndrome to be severe impairments. There is no opinion from any physician regarding how her impairments affect her ability to work. Thus, the ALJ's physical RFC determination is not supported by substantial evidence.

The undersigned finds that the ALJ failed in his duty to fully and fairly develop the record. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited [her] ability to engage in work-related activities." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citation omitted). This can be done by recontacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512; Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). The ALJ's duty to fully and fairly develop the record is independent of Claimant's burden to press her case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). "The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment. They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 1989). "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in the original).

The residual functional capacity determined by the ALJ is not supported by substantial evidence inasmuch as the ALJ appeared to rely on the opinion of a non-medical single decision-maker. The only medical opinion on the record was that of Dr. Barbin, and the ALJ found her opinions to be inconsistent with the record as a whole and did not give them controlling weight. There is no medical opinion in the record from any physician regarding Claimant's work-related

limitations. Claimant did not undergo a consultative physical examination. Thus, the record is devoid of any other physician expressing an opinion regarding claimant's physical or mental ability to function in the workplace. As a result, the undersigned will reverse the decision of the Commissioner and remand this matter to the ALJ for the limited purpose of obtaining medical evidence addressing claimant's ability to function in the workplace and perform work-related activities, and reassess her residual functional capacity.

In short, this case should be remanded to the ALJ for further development of the record. On remand, the ALJ should contact a consulting physician for clarification and/or explanation of Claimant's limitations and their relationship to her ability to perform work-related activities and to function in the workplace. Once the ALJ properly determines Claimant's RFC and supports that RFC with substantial medical evidence, the ALJ should re-contact the VE and pose a hypothetical reflecting that RFC. "A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." Hutton v. Apfel, 175 F.3d 651, 656 (8th Cir. 1999). Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings.

Claimant might well not be disabled within the meaning of the Act. For the foregoing reasons, however, the ALJ's decision is not supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and that the case be **REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum and

Order.  A separate Judgment in accordance with this Memorandum and Order is entered this same

date.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __25th__ day of March, 2014.